## CAMDEN IRONWORKS v. MASTERSON et al.

(Supreme Court, Appellate Division, First Department. May 5, 1905.)

**1. SALES—INSPECTION OF GOODS BY THIRD PERSON.**

Defendant, who had contracted to lay certain iron pipe and castings for a city, contracted with plaintiff to furnish the pipe and castings in accordance with the specifications governing defendant's contract with the city. These provided that the pipe should be free from defects, and should be inspected at the foundry by inspectors appointed by the city. The inspectors rejected pipe which plaintiff claimed was perfect, and it notified defendant that it would furnish no more pipe until inspectors were changed, or certain pipe which had been rejected was accepted. There was no evidence of bad faith on the part of defendant or the inspectors. *Held*, that plaintiff's refusal to furnish more pipe was unjustifiable, and a breach of its contract.

**2. SAME—TERMINATION OF CONTRACT.**

After such refusal, failure of plaintiff to furnish pipe after notice from defendant that, if delivery of pipe was not recommenced within a certain time, he would make other arrangements for the completion of the contract, entirely terminated the contract, so that defendant was not liable for pipe afterwards shipped.

Van Brunt, P. J., and Patterson, J., dissenting.

Appeal from Special Term, New York County.

Action by the Camden Ironworks against William H. Masterson and others. From a judgment for defendants, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

H. G. Ward, for appellant.

L. Laflin Kellogg, for respondents.

INGRAHAM, J. The plaintiff filed a lien upon an amount due to the defendant Masterson under a contract by which the plaintiff was to supply to Masterson certain iron pipe to be used by him in the performance of a contract with the city of New York. The plaintiff, after furnishing some pipe under the contract, for which it was paid, refused to complete the contract upon the ground that the inspectors appointed by the city to inspect the pipe before delivery had acted unjustly and arbitrarily in rejecting pipe that the plaintiff proposed to deliver, and stated that it would not continue supplying the pipe under the contract unless this complaint was remedied. After considerable correspondence, Masterson gave the plaintiff notice that, unless it complied with its contract within a specified time, they would procure the pipe elsewhere; and, the plaintiff not complying with this notice, Masterson procured other pipe, and so completed his contract with the city. After this notice was given, the plaintiff shipped certain pipe to Masterson, which he declined to accept, and it was to recover for this pipe so shipped that this action was brought.

The contract between the plaintiff and Masterson was dated December 24, 1900, and recited that Masterson had, on the 16th day of November, 1900, entered into a contract with the City of New

York to furnish and lay certain cast-iron pipe and special castings, all as set forth in the specifications in said contract between the city and Masterson, specifically referred to, and that the plaintiff agreed to furnish and deliver to said Masterson "one-third (⅓) of the cast-iron pipes, and one-half (½) of the special casting named on page nine (9) of said specifications, and to deliver them on cars at Aqueduct and Baldwin Stations and at stations between them, on the Long Island Railroad, and the said William H. Masterson thereby agreed to receive the pipes and special castings at the above-named stations, and to pay for them at the rate of twenty-five dollars and forty cents ($25.40) per ton of 2,240 pounds for the straight pipes; three cents (3c.) per pound for ordinary special castings, and six cents (6c.) per pound for such breeches pipes as might be needed. All of the said pipes and special castings were to be made in accordance with the specifications and plans of the department of water supplies, New York City, and were to be delivered not later than the first day of July, A. D. nineteen hundred and two." Subsequently, on February 5, 1901, by a subsequent contract, it was agreed that the plaintiff should furnish and deliver to Masterson one-half, instead of one-third, of the cast-iron pipes therein mentioned. The contract between Masterson and the city of New York specified the quality of pipe and castings that were required, and provided for certain tests to determine the quality of the pipe to be delivered under the contract. These tests were to be made by inspectors appointed by the city of New York at the cost and expense of Masterson. The specifications upon which this contract was made between the city and Masterson provided for the tests to be made. One clause of these specifications provided:

"The castings shall be free from scoria, scabs, cold shuts, sand holes, blow gates, gate shrinks, checks and core cuts, together with any and all imperfections caused by improper materials or manipulation. No plugging, cementing or other stopping up of holes and flaws will be allowed, and no painting shall be done until after the castings have been inspected by the authorized agent."

Another clause provided:

"All the 48 inch pipe and special castings shall be subjected to a proof by water pressure of 200 pounds to the square inch; all of the 36 in. and 30 in. pipe and special castings shall be subjected to a proof by water pressure of 250 pounds to the square inch; all the pipe and special castings of a smaller diameter than 30 inch shall be subjected to a proof by water pressure of 300 pounds to the square inch. Each pipe while under the required pressure shall be rapped with a hand hammer from end to end to discover whether any defects have been overlooked. Any pipe or special casting which fails under this test shall be rejected. This inspection and test shall be made at the foundry under the direction of the inspector and at the expense and risk of the contractor."

Another clause provided:

"The contractor shall notify the engineer at least seven (7) days previous to the commencement of the manufacture of the castings, of the time and place where the manufacture is to commence, in order that the inspector may be present and supervise the same; any or all castings which may be without complying in every respect with the terms of this paragraph shall be rejected."

On the 3d of January, 1901, Masterson inquired of the plaintiff's agent when the plaintiff would be ready for the inspector of pipes, and the plaintiff's agent answered that they would require the inspector in one or two weeks. Subsequently, on January 15, 1901, the plaintiff wrote to Masterson, saying that they would be ready for the inspector on the 17th. Shortly after the plaintiff commenced to complain of the inspector, and stated that the experience that it had had with this inspector in the past was such as to warrant it in strongly objecting to his selection for this part of the work; that it was impossible to make pipes which were absolutely perfect in all points, and the inspector referred to on previous work made it a practice to reject thoroughly good pipe fully coming up to the spirit of the specifications, and pipes that would be accepted by other inspectors. Again, on January 24, 1901, the plaintiff asked whether Masterson had been able to secure "a satisfactory inspector," and on January 24th Masterson wrote to the plaintiff to say that they hoped to be able to give definite information in regard to having the inspector transferred. Again, on February 26th, Masterson wrote to the defendant, stating that he had endeavored to obtain instructions for the inspector to accept certain pipes which he had rejected. On December 18 and 23, 1901, the plaintiff again complained that certain of their pipes had been rejected for unimportant defects, and that the work had been stopped because of impracticable inspection. During all this time Masterson was insisting upon the plaintiff's complying with its contract, that he had not the control of the inspector, and that plaintiff should supply pipe in accordance with the contract that it had made, and there were constant promises by the plaintiff to comply with these demands. In July and August Masterson was insisting upon the plaintiff complying with its contract, and complaining of lack of pipe required for the work; to which plaintiff replied by constant complaint as to inspection, with promises to ship the pipe; and, finally, on September 16, 1901, the plaintiff wrote the defendant:

"We have been doing our utmost to furnish the needed castings on your order in spite of most unreasonable, retarding and exceedingly costly inspection. Rejections of large expensive pieces have been made steadily for most trivial reasons, until now we are compelled to advise you that until the difficulty is remedied, we shall be obliged to cease making any further pieces, either of specials or of pipe. It is impossible to work under the unprecedented treatment which we have suffered under this present inspection. * * * In the face of this experience we are helpless and we are compelled therefore, to write as above that we cannot proceed under such experience."

In answer to this letter, on September 17th, Masterson wrote the plaintiff:

"Answering your letter of the 16th regarding inspection we submitted your letter this a. m. to the department and we were informed that the trouble lies in the pipe and castings which do not come up to the requirements. Now of course we have done what we could in this matter previously and now, but can accomplish little. You state you shall be obliged to cease making the pipe and specials, and this will place us in a bad position as we need the specials in the worst way, as you are aware. Can you not hurry the 36" pipe and 24" curves as per our telegram? These are essential to further progress in the work on the first section."

On November 19, 1901, Masterson wrote the plaintiff that he had not received a shipment of straight pipes since October 2d, and asking if the plaintiff had cast any since, as he would like to know how the matter stood; and on November 20th the plaintiff wrote to Masterson:

"We note your esteemed favor of the 19th as to 48″ B. & S. pipe. We wrote you that the inspection under which we had been compelled to work had become unendurable—and we declined to make any more pipe until we could be assured of fair and reasonable treatment. We have awaited the action of the department on this point. When they are ready to furnish us with an inspector who will treat our work as do other inspectors—even the most exacting—we will arrange to put in your work in the space occupied by the other work which we put in while this question was unsettled, and which will run out in two or three weeks. There are many pipes now in our yard—rejected for trifling reasons—which should be taken, and we hope consent will be given to ship them."

On December 4, 1901, Masterson wrote that the plaintiff had failed to observe the conditions of their contract from the beginning, not only in the quality of pipe delivered, but as to the time of delivery; that the damage that Masterson had suffered was very great; that in a letter of November 20th from the plaintiff they refused to make further deliveries unless Masterson was able to control the inspection of the city—a matter absolutely beyond Masterson's power; and the letter continued:

"I therefore give you notice that unless you proceed at once, within five days, to make proper, sufficient and continuous deliveries of pipe under my contract, I will treat your failure so to do as a breach of contract, purchase the pipe elsewhere, and hold you responsible, both for the past and future damages resulting from your conduct."

It was proved on behalf of the defendant that the last delivery that was made by the plaintiff of any straight pipe was on October 2, 1901; that there was some special sent after that, but no straight pipe delivered; and there was no attempt to comply with this notice of December 4, 1901, by the plaintiff until the latter part of December. There is no dispute but that the plaintiff, prior to its letter of November 20th, had stopped work under the contract, had refused to make any more castings until an inspector was appointed who would meet with its views as to the sufficiency of the pipe, and then stood on its notice that it would refuse to further comply with the contract. The necessities of the situation required that Masterson should obtain pipe to complete his contract with the city, as he was under very severe penalties for a failure to comply with it, and immediately after the letter of December 4th he endeavored to secure pipes from other foundries, and finally succeeded in February in making a contract under which pipe was delivered and used. The inspectors who had acted on behalf of the city were called, and testified as to the inspection. They testified that they acted in entire good faith in rejecting the pipe, and that it did not comply with the contract and specifications; and the whole evidence shows that Masterson did everything that he could do to secure inspectors who would be satisfactory to the plaintiff. It is apparent from this testimony that when it made the

contract the plaintiff understood the situation and the conditions of the contract and specifications between Masterson and the city. It understood that the pipe which it furnished for Masterson was to pass an inspection by the city inspectors, and the pipe which the city inspectors refused to accept would be perfectly useless to Masterson, as it could not be used by him in his contract with the city. A contractor, under those circumstances, would not be justified in refusing to comply with his contract because the inspectors who, by the contract, were to determine what pipes should be accepted as a compliance with the contract, refused to accept pipes which he claimed should be accepted. What the plaintiff wanted was to have its views as to the quality of the pipe which it manufactured adopted, instead of the views of the inspectors who, by the contract with the city, were to determine whether or not the pipe was of the quality required by the contract; and when plaintiff took the position that it would refuse to deliver any more pipes until the inspectors who were to determine whether the pipe was in compliance with the contract or not were changed there was a distinct breach of its contract, which justified Masterson in terminating it and refusing to accept any pipe subsequently offered; and when Masterson, in his letter of December 4, 1901, gave the plaintiff five days' notice to commence delivery of the pipe according to its contract, with a notice that unless it commenced such delivery within that time he would make other arrangements for the completion of the contract, and the plaintiff failed to comply with that notice, there was an end of the contract, and Masterson was under no obligation to accept further pipe shipped by the plaintiff. From beginning to end the plaintiff took an untenable position in regard to this inspection, and there is not a particle of evidence to show that there was any bad faith on the part of Masterson or the city authorities. The utmost that can be said is that there was a difference of opinion as to the quality of the pipe manufactured by the plaintiff and the inspectors of the city, a condition which the clauses in the contract and specifications requiring an inspection by the city inspectors was expressly designed to meet, and by it the determination of that question was to rest upon the city inspectors.

The principle stated in Montgomery v. The Mayor, 151 N. Y. 249, 45 N. E. 550, I think, applies. That was an action by a contractor against the city for damages sustained in consequence of the arbitrary acts of inspectors in refusing to accept materials which the plaintiff contended were a compliance with the contract, but which the inspectors had declined to pass. In affirming a judgment for the defendant in that case the court said:

"The effect of these provisions was to invest in the inspector a right or capacity to pass upon the performance of the work, which came very near to constituting him, as between the parties, the judge as to the matter. The plaintiff's cause of action for damages is based upon an increased cost of the work, alleged to be due to the action of the inspector in delaying the work through his rejection of materials which were in accordance with the plans and specifications. The plaintiffs' evidence shows that the inspector fre-

quently did reject the pipe and cement intended to be used, and, possibly enough, that he was very arbitrary in doing so. * * * It may be true that his objections were not sound, and perhaps his superior officers should have listened more indulgently to the plaintiffs' complaint concerning the inspector's action. But assuming the truth of all this, we fail to see how any cause of action has arisen against the city for these damages. It would be very extraordinary, and we think it would constitute an unsafe precedent in future cases, if contractors with the city under these contracts could maintain actions against it for damages where the execution of the work contracted for was delayed, upon the ground that the delay was by the officers who, by the force of the contract, were invested with the power of supervision."

While in this case the plaintiff was not executing a contract made between itself and the city, it was proceeding to supply to a city contractor pipes which were to be used under the contract with the city, with knowledge of the fact that before Masterson could use these pipes they would have to be accepted by the city's inspector, who, under the contract between Masterson and the city, was given authority to pass upon the quality of the pipe to be used in the performance of the contract with the city. In the absence of any proof of bad faith on behalf of Masterson, the city, or the inspectors in rejecting pipe manufactured by the plaintiff, the plaintiff could not insist that its pipe should be accepted when rejected by the inspectors. If, however, the pipe rejected did comply with the contract, and plaintiff was not bound by the decision of the inspectors, it could have delivered the pipe to Masterson, and then insisted on such a delivery as a performance of the contract.

Whether or not this inspection was arbitrary or unnecessarily severe is not the question, and the testimony which was excluded by the court was entirely immaterial in determining the question at issue, for upon the undisputed testimony the plaintiff gave notice to Masterson that it would refuse to proceed further with its contract, and Masterson acted upon that assumption, treated the contract as terminated, and proceeded to obtain the pipe necessary from other parties. I think that Masterson thus acted clearly within his right, and that the plaintiff had no cause to recover for the pipe subsequently delivered.

My conclusion is that the judgment appealed from should be affirmed, with costs.

McLAUGHLIN and LAUGHLIN, JJ., concur.

PATTERSON, J. (dissenting). This action was brought to foreclose a mechanic's lien filed by the plaintiff against the city of New York; William H. Masterson, a contractor with the city; Thomas J. Dunn and John H. Deeves, sureties upon a bond given under the statute to remove the lien and as security to the plaintiff for its claim. After the trial, judgment was entered upon a decision of the court dismissing the complaint, canceling the lien, and directing judgment in favor of the defendant William H. Masterson against the plaintiff upon a counterclaim. It was stipulated on the trial that no liability rests upon the city of New York, and

consequently that defendant has no further interest in the litigation. The contest is therefore between the plaintiff and the other defendants. The contract between Masterson and the city was for the furnishing, delivering, and laying of a large quantity of 48-inch cast-iron pipe for a double pipe line to be laid between "the Milburn engine house and the Milburn efflux chamber," and for a single pipe line from that point "to the gate chamber at Spring creek," and "for the furnishing and setting of check valves and stop cocks, pursuant to specifications annexed to the contract"; which contract provided that "each pipe while under required pressure shall be rapped with a hand hammer from end to end to discover whether any defects may have been overlooked, and the pipe or special castings which fails under this test shall be rejected. This inspection and test shall be made at the foundry under the direction of the inspector, and at the expense and risk of the contractor." It is also provided that a final inspection should be made after delivery of the articles on the line of the work. On December 24, 1900, Masterson entered into a contract in writing with the plaintiff, through its agents, Messrs. R. D. Wood & Co., in which the contract with the city of New York is referred to, and in which it is provided that the plaintiff should furnish to Masterson one-third of the cast-iron pipes and one-half of the special castings; "all the pipes and special castings to be made in accordance with the specifications and plans of the water department supply of this city; are to be delivered not later than the 1st day of July, 1902." The contract with the plaintiff was subsequently modified on February 5, 1901, and by the modification the plaintiff agreed to furnish one-half, instead of one-third, of the cast-iron pipes. Deliveries were made by the plaintiff to Masterson of some of the materials embraced in the contract between those parties, and it is alleged in the complaint that the value of such materials so furnished was $83,893.17, upon which a payment of $67,661.01 had been made, leaving an amount due and owing by Masterson to the plaintiff of $16,277.16. It was found by the trial court that the amount due to the plaintiff under the contract for pipe and castings which it would have been entitled to receive had it not been guilty of a breach of its contract, was the sum claimed by the plaintiff; and it was also found that the plaintiff had been paid on account the amount admitted. As against the claim of the plaintiff for the balance, the defendant Masterson set up in his answer a counterclaim, in which, among other things, it was alleged that the plaintiff was guilty of a breach of its contract, and that it had failed to perform and carry out the same; that it did not deliver pipe and castings as the contract required, and had failed and refused to carry out the terms and conditions of the contract on its part to be performed. The defendants Dunn and Deeves, in their answer, set up as separate defenses the breach of the contract as alleged in the answer of the defendant Masterson. The plaintiff, in its reply, admitted that the cast-iron pipe and special castings mentioned in the counterclaim were to be furnished and delivered to the defendant as mentioned in the specifications of Masterson's contract with

the city, but it did not admit that it agreed to deliver the pipe within the time mentioned in the answer. Respecting the substance of the counterclaim, the plaintiff alleged that no inspectors were furnished to it before the middle of February, 1901, and that the inspection of the pipe and special castings manufactured by it was then and thereafter so unfair, unreasonable, and improper that much of the pipe and castings manufactured by it was rejected, although they fully conformed to the specifications contained in the defendant's contract with the city. As another defense to the counterclaim the plaintiff admitted that, though it did on or about the 16th of September, 1901, refuse to continue manufacturing until a reasonable inspection was given its work, still it was ready immediately to deliver pipe and special castings which had been unreasoably rejected, and which conformed to the specifications contained in the defendant's contract with the city of New York, and that it subsequently continued to manufacture and deliver, and the defendant continued to accept, pipe and special castings from it until on or about December 30, 1901, when the defendant Masterson refused to accept the pipe already delivered at Valley stream and pipe actually in transit, and notified the plaintiff that he would make a contract with other parties for the pipe yet to be delivered.

That the plaintiff did not deliver pipe to Masterson in accordance with the terms of its contract is clear; but we are not able to conclude from the evidence that Masterson is entitled to recover damages for mere delay. There is in the record enough to indicate that the failure to deliver from time to time was a matter which the parties regarded as something not insisted upon by Masterson, and possiby waived by him. The real controversy relates to the plaintiff's having an honest, valid, and sufficient excuse for refusing to proceed with its contract. The relations established between the plaintiff and Masterson by their contract are plain. The plaintiff in no way bound itself to all the terms and conditions of Masterson's contract with the city. It agreed to manufacture one-half the pipe and a certain portion of the special castings. Nevertheless, it was bound to furnish such pipe as complied with the specifications of the contract between Masterson and the city. Its contract with Masterson required that all the pipe and special castings should be made in accordance with the specifications and plans of the department of water supply. The specifications of the contract require that the castings "shall be free from scoria, scabs, cold shuts, sand holes, blow gates, gate shrinks, checks, and core cuts, together with any and all imperfections caused by cracked or crushed cores, or other defects or imperfections caused by improper materials or manipulation." The contract between Masterson and the city provided that pipe to be furnished should be inspected by inspectors appointed or selected by the city of New York, and it recites, as before remarked, that "each pipe while under required pressure shall be rapped with a hand hammer from end to end to discover whether any defects have been overlooked, and the pipe or special casting which fails under this test shall be rejected. This inspection and test shall be made at the foundry under the

direction of the inspector, and at the expense and risk of the contractor." It also provides for a final inspection of the pipe and special castings after delivery on the line of the work, and that the approval of any pipe or casting by the inspector shall not prevent its rejection if any imperfection shall be discovered at any time before the final acceptance and payment for the entire work included in the contract. Although the plaintiff was not bound by all the terms of the contract between Masterson and the city, its officers understood that the articles to be manufactured. and delivered by them under the contract with Masterson were to be subject to the inspection provided for in his contract with the city. The best evidence of that is that the plaintiff acted upon that understanding, and placed its reply to the counterclaim of Masterson upon the ground that the inspection by the city inspectors of its product was not made in good faith, and that much of the product of its factory intended for Masterson was arbitrarily and unjustly rejected by those inspectors. In addition, it invited the attendance of the inspectors. While the inspectors were not, in a strict sense, agents of Masterson, yet by his contract with the city he clothed them with authority to pass upon the sufficiency of the articles to be furnished. He made the subcontract with the plaintiff in view of the inspection thus to be made, and he had stipulated with the city that it be made at the place of manufacture. It was with his consent that the inspectors went there, and the plaintiff contracted with him, and not with the city, as to inspection. That inspection was required for Masterson's protection. There was no privity between the city and the plaintiff. Masterson authorized the city inspectors to act, and if they acted in bad faith the plaintiff had no remedy against or claim upon the municipality. The right of inspection was conceded, but the good faith of the inspectors in rejecting the articles is open to inquiry. If the articles were manufactured in accordance with the specifications, Masterson was under obligation to take them. If they did not conform to the specifications, and were honestly and fairly rejected by the inspectors, then there was a breach of the contract by the plaintiff in refusing to make deliveries, and it would properly be held responsible for damages sustained.

It is urged by the respondent that the refusal of the city inspectors to accept the pipe would not justify the plaintiff in refusing to perform its contract. We are of opinion that it would. Misconduct of the inspectors amounting to bad faith would certainly have been an excuse to Masterson (Gearty v. The Mayor, 171 N. Y. 61, 63 N. E. 804); and the same rule should apply between the plaintiff and the defendant. The contract, although not based in express terms upon city inspection, was construed and acted upon as requiring the plaintiff to submit to that inspection, and under the reply of the plaintiff to the counterclaim and the proof as made it is immaterial that a provision to that effect was not inserted in the subcontract.

The facts in connection with the refusal of the plaintiff to complete the contract with Masterson are, in brief, the following: On

January 15, 1901, the plaintiff notified Masterson that it was ready for the city inspectors. They went to the plaintiff's factory early in February, and deliveries under the contract commenced soon thereafter. It was claimed by Masterson that the pipes were not delivered in sufficient quantities, and on February 25th Draddy, Masterson's general manager, went to Philadelphia, where he was informed that the plaintiff was having trouble with the inspector. There still being some delay in deliveries, Draddy went again to Philadelphia on March 2d, and was again told that the difficulty was with the inspectors; that the pipes were rejected for trivial and insufficient cause. This condition continued until July 26th, when Draddy again went to Philadelphia, and the same reason was assigned for delay. During all this time complaint was being made by the city. On September 26th, in answer to demands for more pipe, the plaintiff wrote Masterson:

"We have been doing our utmost to furnish the needed castings on your order in spite of most unreasonable, retarding and exceedingly costly inspection. Rejections of large expensive pieces have been made steadily, for most trivial reasons, until now we are compelled to advise you that until the difficulty is remedied, we shall be obliged to cease making any further pieces, either of specials or of pipe. It is impossible to work under the unprecedented treatment which we have suffered under this present inspection."

Masterson replied that he had submitted the plaintiff's letter to the department, and was notified that the trouble lay in the pipe and castings, which did not come up to requirements. Again, on September 25th, Masterson wrote, urging deliveries, and to this letter a telegram was received, asking him to meet the plaintiff's treasurer. At this meeting on September 26th the representative of the company stated that it could not make pipe under the inspection, and would not make any further deliveries. Nevertheless, on October 2d, a further shipment was made, which was received about the 15th. After that Masterson continued to urge further deliveries, and on November 19th he wrote, stating that he had received no shipment since the one of October 2d, and asking how the matter stood. On November 20th the plaintiff replied: "We wrote you that the inspection under which we have been compelled to work had become unendurable, and we decline to make any more pipe until we are assured fair and reasonable treatment." On December 4th Masterson notified the plaintiff that unless they proceeded within five days to make deliveries he would treat the failure to do so as a breach of the contract, and purchase elsewhere. No pipe, within the time fixed by this notice, was received, and Masterson made efforts to secure the balance at the most reasonable and favorable figures, and finally entered into a contract with the United States Cast Iron Pipe & Foundry Company.

From all this evidence we think it is established that there was a breach of the contract on the part of the plaintiff after December 4th which justified Masterson in procuring the balance of the pipe from sources other than the plaintiff, unless the plaintiff had a valid excuse for its default. Masterson was not bound to look to such other sources of supply until it was definitely ascertained that

the plaintiff would not proceed with its contract. The excuse con-
sists in the alleged unfairness and bad faith of the inspectors. The
question, then, remains of the character of the inspection made by
the city inspectors. Was it so unreasonable and unfair as to justify
the plaintiff in the course it pursued respecting its contract? The·
inspection was made at the factory of the plaintiff by three in-·
spectors—Bennett, Bates, and Samuels—who were witnesses called.
by the defendant Masterson. Bennett was a "superintendent in-
spector." He testified that he inspected nearly all the pipe manu-
factured by the plaintiff after April 10th, and that he found defects·
therein; and that "none of these pipes that I rejected were free·
from some of the defects mentioned in section 90 of the contract."
Bates, another inspector, testified at great length as to the finding·
of defects in the pipe; that some he could see with the naked eye,.
and that he would then test them with the hammer to discover.
how deep or extensive they were. · Samuels, another inspector,
who accompanied Bates, also testified to the inspection and the
use of the hammer and that the pipes rejected had defects.

On all the evidence upon the subject of inspection there arose a
disputed question of fact. Although no precise finding was made·
upon that question by the trial judge, he must have resolved it in.
favor of the defendant Masterson, and under the proofs we would
not feel justified in reaching any other conclusion. But there are
two erroneous rulings of the court in the rejection of evidence of-·
fered by the plaintiff which should have been allowed on the issue·
of the character of the inspection. The obvious intent of the plain-·
tiff was to show that the inspection made by the hammer in the
way in which it was made injured the pipe, and that defects for·
which much of it was rejected were created by the inspectors. It
is fairly to be inferred from all the evidence that scoria, to some
slight extent, will be present in all castings such as were the sub-
jects of the plaintiff's contract. Bates testified that whatever scoria
there was would necessarily, in such pipe castings, rise to the top·
of the spigot end, because it would be lighter than the molten iron.
He testified that the majority of the pipe he rejected was defective·
in the spigot end, and that he discovered the defects by the use
of the hammer on the outside edge; that the defects he found were·
in the rim and in the base of the head; that they were discovered
by the eye, but that, if his eye told him there was scoria there, that
would not be enough to reject the pipe. He would then use the·
hammer. If there were a greater amount of it, he would have the·
pipe cut. If there were other indications of scoria, but not very
much to be seen, he would want to use the hammer for the purpose
of seeing how deep it went; that it was not that the pipe must be
absolutely free from scoria, but must be so far free that the useful-·
ness of the pipe would not be affected; that a little, perhaps, would
be of no damage; and he said that it was scoria to a large amount
for which he would reject the pipe. Samuels testified that he ac-
companied Bates, and inspected the pipe at the plaintiff's factory.
His method of inspection was slightly different from that followed·
by Bates, but the use of the hammer was practically the same. This·

witness (Samuels) was asked on cross-examination whether, if he found that there were indications of scoria or blow holes in the end of the pipe, he would pursue it further with the hammer, to which he answered "Yes." He was then asked, "In order to see how far it went into the iron? Answer. Yes." He was further asked how far it must go into the iron, in his opinion, to make the pipe defective, to which he replied that he was not supposed to have an opinion upon that, and that he had his specification to go by. "Q. I ask you your opinion." That was objected to. After colloquy between the court and counsel, the court said: "If you attach much importance to it, I will allow it, and overrule the objection." The witness declined to answer, stating that it was none of his business. Thereupon the court was requested to instruct the witness to answer the question. The witness stated that he would not like to give an answer without the specifications, and he then undertook to present his reasons for declining to answer. The court refused to instruct the witness as requested for the reason that the question called for an expert opinion, which the learned judge did not think he could force the witness to give, and authorized him not to answer the question unless inclined to, to which counsel for the plaintiff excepted. The opinion asked for was not that of a witness called merely as an expert. The question called for the opinion of the man who made the inspection, who used the hammer (which was to be used by rapping), and it was put with reference to the particular pipe which he inspected and upon which he used the hammer. The fullest cross-examination of this witness should have been allowed, and the competency of the inspector to make the inspection by the use of the hammer was material to the plaintiff's case, particularly as it insisted all through the trial that it was the inspection itself that destroyed the pipe, or some of it.

Again, the court excluded the testimony of expert witnesses by whom the plaintiff intended to show that the inspection was unusual, improper, and unfair, and that by the use of the hammer pipe which fully conformed to the specifications were disfigured, and in some cases destroyed, by the inspectors. It is stated in the record that, in order to prevent the waste of time that would be occupied in interrogating the witnesses who were in court, the admissibility of the evidence was considered on an offer of proof. The court declined to take the testimony of these witnesses, sustaining an objection of counsel for the defendant Masterson that the plaintiff was bound by the inspection just as Masterson was. The plaintiff insisted upon its right to call the witnesses for the purposes above stated, and the court said that it would not permit the plaintiff to offer proof of anything except fraud, corruption, or bad faith on the part of the inspectors. We are of opinion that the plaintiff had the right to show that the inspectors were acting ignorantly and wantonly in disregard of proper inspection, as required by the specifications. The offer of the plaintiff included proof not only that the inspection was improper, but that it disfigured and destroyed the pipe, and that the rejected pipe in "a vast majority of cases conformed to the specifications." It is claimed,

however, by the defendant Masterson that the inspection was absolutely conclusive and binding upon the plaintiff. That might be so were it not for the element of bad faith in the conduct of the inspectors. The case of Montgomery v. The Mayor, 151 N. Y. 249, 45 N. E. 550, does not apply. That was a case in which it was held that a contractor with the city for work and materials cannot maintain an action against it for damages caused by the rejection of materials by an official vested by the contract with the power of inspection and rejection, and whose power has been recognized by the contractor by procuring and completing the work with other materials. In that case damages were claimed for increased cost of work occasioned by the defendant and its agents in delaying the work. The inspector rejected pipe and cement, and the court said that possibly he was very arbitrary in doing so. The plaintiffs there were not otherwise prevented from going on with the work than by the objections made by the inspector to the suitableness of the materials. In the present case the question is as to the acts of the inspectors not being arbitrary merely, but as creating defects for which the pipe was rejected, and consequently of their bad faith in rejecting that pipe. After one rejection it was not incumbent upon the plaintiffs to deliver the articles on the line of the work for a second inspection.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event.